FILED

07 NOV -8 AM 10: 03

CLERK. U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _PDL_    DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

## ARREST ON OUT-OF-DISTRICT OFFENSE

CASE NUMBER:    **'07 MJ 2624**

The person charged as  _PEREZ, Jose Manuel Lopez_ _____ now appears before this

United States District Court for an initial appearance as a result of the following charges having been filed in the

United States District Court for the _Central_____ District of_____ _California_ _____ on

_11/16/05_____ with:____ **Title 21 USC 846**_____**in violation of:**

**CONSPIRED AND AGREED WITH EACH OTHER TO KNOWINGLY AND INTENTIONALLY (a) POSSESS WITH INTENT TO DISTRIBUTE AND (b) DISTRIBUTE APPROXIMATELY 832.3 GRAMS OF A MIXTURE OR SUBSTANCE CONTAINING A DETECTABLE AMOUNT OF METHAMPHETAMINE, A SCHEDULED II CONTROLLED SUBSTANCE, IN VIOLATION OF TITLE 21, UNITED STATES CODE, SECTION 846.**

The charging documents and the warrant for the arrest of the defendant which was issued by the above United States District Court are attached hereto.

I hereby swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED:  _____11/08/07_____

_____
Jeff Tyler
CI -Deputy United States Marshal


Reviewed and Approved

DATE:

_____
Assistant United States Attorney

ORIGINAL

3513

# United States District Court

_____CENTRAL_____ DISTRICT OF _____CALIFORNIA_____ 1095512

UNITED STATES OF AMERICA
v.

JOSE MANUEL LOPEZ PEREZ

ED 05 -WA00827 M-3
WARRANT FOR ARREST
ON COMPLAINT

CASE NUMBER:

To:  The United States Marshal or any
Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest ____JOSE MANUEL LOPEZ PEREZ____
                                                                                    Name
and bring him forthwith to the nearest Judge/Magistrate to answer a
complaint charging him with conspiring and agreeing in San Bernardino
County, within the Central District of California, to knowingly and
intentionally (a) possess with intent to distribute, and (b) distribute,
approximately 832.3 grams of a mixture or substance containing a detectable
amount of methamphetamine, a schedule II controlled substance, in violation
of Title 21, United States Code, Section 846.

**TO BE DETERMINED AT INITIAL APPEARANC**

            with Bail fixed at $ _____
            REC: BY AUSA          DETENTION

Date: November 16, 2005            HONORABLE STEPHEN G. LARSON

                                   Name of Judge/Magistrate Judge

                                   Signature of Judge/Magistrate Judge

| RETURN | | |
|---|---|---|
| This warrant was received and exected with the arrest of the above-named defendant at _____ | | |
| DATE RECEIVED | NAME & TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
| DATE OF ARREST | | |

AO 91
Rev. 11/82

## CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>GABRIEL SALAS, JUAN SALAS, and<br>JOSE MANUEL LOPEZ PEREZ | DOCKET NO.<br>ED **05 - 00327 M3**<br><br>MAGISTRATE'S CASE NO. |

Complaint for a violation of Title 21, United States Code, Section 846

| NAME OF MAGISTRATE JUDGE<br><br>HON. STEPHEN G. LARSON | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Riverside<br>San Bernardino County |
|---|---|---|
| DATE OF OFFENSE<br><br>November 14, 2002 | PLACE OF OFFENSE<br><br>San Bernardino County | ADDRESS OF ACCUSED (IF KNOWN) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION :

On or about November 14, 2002, in San Bernardino County, within the Central District of California, defendants (1) Gabriel Salas, (2) Juan Salas, and (3) Jose Manuel Lopez Perez, conspired and agreed with each other to knowingly and intentionally (a) possess with intent to distribute and (b) distribute approximately 832.3 grams of a mixture or substance containing a detectable amount of methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Section 846.

FILED
CLERK, U.S. DISTRICT COURT

NOV 16 2005

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

LODGED
NOV 16 AM10:41
U.S. DISTRICT COURT
CENT. DIST. OF CALIF.
RIVERSIDE

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the<br>foregoing is true and correct to the<br>best of my knowledge. | SIGNATURE OF COMPLAINANT<br>Robert Mendenhall |
|---|---|
| | OFFICIAL TITLE<br>Drug Enforcement Administration - Task Force Officer |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br><br>STEPHEN G. LARSON | DATE<br><br>November 16 2005 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.
AUSA: Gregory A. Lesser    REC:
GL

# AFFIDAVIT

I, Robert A. Mendenhall, being duly sworn, hereby depose and state:

## IDENTITY OF AFFIANT

1. I am a Task Force Officer ("TFO") with the United States Department of Justice, Drug Enforcement Administration ("DEA"). I am currently assigned as a TFO to the DEA's Riverside District Office ("RDO"). I have been assigned to the DEA Task Force - RDO since April 2, 2001. Since then, I have been involved in approximately 20 investigations involving the large scale transportation, distribution, and manufacture of narcotics.

2. Since June 30, 1988, I have been a duly authorized and active peace officer for the California Highway Patrol. Prior to being assigned to the Riverside DEA Task Force, I had been assigned for approximately ten years to the California Highway Patrol's Canine Narcotic Enforcement Team ("CNET"). The CNET unit's primary objective was interdiction of narcotics on California's roadways. While an officer with the California Highway Patrol, I have been involved in over five hundred narcotics investigations, including investigations and arrests of suspects for various narcotics offenses ranging from being under the influence, and simple possession, to possession for sale, manufacturing, and transportation of narcotics. During these investigations, I have interviewed numerous defendants, informants, and witnesses to narcotics violations. I have also participated in conducting surveillance and have worked in an undercover ("UC") capacity. Many of the investigations in which I have participated have also related to money laundering violations involving narcotics proceeds and conspiracies associated with drug distribution.

3. By way of education, I have an associate degree in business administration from

1

Cypress College, and have completed a twenty-two week law enforcement academy conducted at the California Highway Patrol Academy in Sacramento, California. I have also completed over 300 hours of narcotics training, which has included, but is not limited to courses involving the detection of persons under the influence, packaging, distribution, transportation, manufacturing, possession, and sales of narcotics.

## PURPOSE OF AFFIDAVIT

4. This affidavit is made in support of

(a) criminal complaints and arrest warrants for the following individuals on the following charges:

(1) Gabriel Salas ("G. SALAS"), for conspiracy in violation of 21 U.S.C. Section 846 to knowingly and intentionally distribute methamphetamine, a schedule II controlled substance, in violation of 21 U.S.C. 841(a)(1). Gabriel SALAS appears on the left side of the photograph attached hereto as Exhibit 2.

(2) Juan Salas ("J. SALAS"), for conspiracy in violation of 21 U.S.C. Section 846 to knowingly and intentionally distribute methamphetamine, a schedule II controlled substance, in violation of 21 U.S.C. 841(a)(1). A photograph of Juan SALAS is attached hereto as Exhibit 3.

(3) Jose Manuel Lopez Perez, ("PEREZ"), for conspiracy in violation of 21 U.S.C. 846 to knowingly and intentionally distribute methamphetamine, a schedule II controlled substance, in violation of 21 U.S.C. 841(a)(1). A photograph of PEREZ is attached hereto as Exhibit 5.

(4) Oscar Ortega ("ORTEGA"), for knowingly and intentionally distributing

2

methamphetamine, a schedule II controlled substance, in violation of Title 21 U.S.C.

Section 841(a)(1). A photograph of ORTEGA is attached hereto as Exhibit 4

(5) Ramon Montez Rodriguez ("RODRIGUEZ"), for knowingly and intentionally

distributing methamphetamine, a schedule II controlled substance, in violation of Title 21

U.S.C. Section 841(a)(1). RODRIGUEZ appears on the right side of the photograph

attached hereto as Exhibit 2.

This affidavit is also in support of (b) a search warrant to search the HEARTLAND Truck Stop,

located at 2250 West Main Street., Barstow, California (the "SUBJECT PREMISES"), as more

completely described below, for evidence of possession with intent to distribute and distribution

of methamphetamine in violation of Title 21, United States Code, Section 841(a)(1), and

conspiracy to do so in violation of Title 21, United States Code, Section 846. An aerial

photograph of the SUBJECT PREMISES is attached hereto as Exhibit 1.

5. This affidavit sets forth only those facts necessary to support the issuance of the

requested complaints and arrest and search warrants, and does not purport to set forth all of my

knowledge with regard to this investigation.

## THE SUBJECT PREMISES

6. The SUBJECT PREMISES is located at 2250 West Main Sreet, Barstow, California.

It is a commercial complex, consisting of three large buildings and several small shed type

buildings, located on the South side of Main Street and the West side of L Street in Barstow,

California. The SUBJECT PREMISES is bounded on the North by Main Street, on the East by a

small drainage that runs between the SUBJECT PREMISES and L Street, on the South by an

earthen embankment leading up to a utility right-of-way, and on the West by thinly vegetated

3

desert. The SUBJECT PREMISES contains several yellowish corrugated metal exterior
buildings and yellow corrugated metal roofs. The three large buildings on the SUBJECT
PREMISES are (1) a truck wash building, with attached cashier's office (2) a restaurant building,
and (3) the manager's office building. There are also several smaller outbuildings including a
shed near the truck wash building entrance. The main entrance sign reads "HEARTLAND
TRUCK STOP TRUCK WASH OPEN 24 HR SCALES RESTAURANT". The SUBJECT
PREMISES includes all buildings and sheds, and rooms, attics, basements and other parts
therein, the surrounding grounds, storage rooms and/or storage lockers, vehicles, and trash
containers which are assigned or allocated for use of the residents or guests of the SUBJECT
PREMISES. An aerial photograph of the SUBJECT PREMISES is attached hereto as Exhibit 1.

## ITEMS TO BE SEIZED

7. As set forth below, there is probable cause to believe that the following items will be
found at the SUBJECT PREMISES:

a. Controlled substances, including methamphetamine,

b. Cash, currency, and records relating controlled substances, income and expenditures of
money and wealth, including but not limited to, pay/owe sheets, money orders, wire transfers,
cashier's checks and receipts, traveler's checks, bonds, stock certificates, cashier's checks,
certificates of deposit, bank statements, passbooks, checkbooks, and check registers, records,
documents, programs, applications, documents and deeds reflecting the purchase, lease or proof
of ownership of real estate, vehicles and other assets relating to controlled substances income;
Books, records, receipts, bank statements, deposit slips, canceled checks, money order receipts,

4

records of electronic money transfers, ledgers, pay/owe sheets, personal phone and address books, handwritten notes and other items evidencing the obtaining, secreting, transfer, and distribution of narcotics and narcotics proceeds as well as identifying information regarding co-conspirators involved in the distribution of narcotics.

c. Photographs of co-conspirators, assets and/or controlled substances.

d. Indicia of occupancy, residency, and/or ownership of the SUBJECT PREMISES described above, including but not limited to canceled mail, deeds, leases, titles, registration books, diaries, utility and telephone bills, tax documentation, travel documents, statements, passports, driver's licenses and/or identification cards, immigration documentation, birth certificates, and keys;

e. Communication devices, such as telephone paging devices, beepers, mobile telephones and car phones;

f. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, for example: scales, presses, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, toy balloons, heat-sealing devices, and diluents;

g. Personal books and papers reflecting names, addresses, telephone numbers, pager numbers, and of identification data relating to the distribution of controlled substances.

h. Firearms and ammunition.

## FACTS ESTABLISHING PROBABLE CAUSE

## I. PROBABLE CAUSE FOR SEARCH, COMPLAINTS AND ARREST WARRANTS

8. In February of 2002, a reliable confidential source told me that methamphetamine was being distributed to truckers at the SUBJECT PREMISES. On March 11, 2002, I spoke to

5

Officer Jeffrey Bubier of the Barstow Police Department. Officer Bubier told me the following:

a. Officer Bubier has received information from citizen informants that the sales of methamphetamine were occurring at the SUBJECT PREMISES.

b. Officer Bubier has made multiple arrests at the SUBJECT PREMISES, related to the sales of methamphetamine involving employees at the truck stop.

9. On April 11, 2002, I and other members of the DEA's RDO established surveillance in the area of the SUBJECT PREMISES in an effort to introduce an undercover agent to purchase methamphetamine. TFO Finneran, another member of the DEA's RDO, acting in an undercover capacity, along with a confidential source ("CS"), drove to the SUBJECT PREMISES in an undercover vehicle in an effort to identify employees who were distributing methamphetamine for sale. I later spoke to TFO Finneran who told me the following:

a. While at the location TFO Finneran and CS spoke with another employee known to TFO Finneran as Gabriel SALAS. TFO Finneran was able to identify Gabriel SALAS from a photograph taken during previous surveillance on April 9, 2002. Specifically, the Barstow Police had interviewed and photographed Gabriel SALAS on April 9, 2002, Gabriel SALAS had shown the interviewing officers his driver license which contained his name. TFO Finneran reviewed this information from the Barstow Police prior to the April 11, 2002 operation. TFO Finneran identified the individual depicted on the left side of the photograph attached hereto as Exhibit 2 as Gabriel SALAS.

b. Gabriel SALAS identified himself as "Gabby," and provided his telephone number of (760) 668-3907.

c. During the conversation with Gabriel SALAS, the CS and TFO Finneran asked

6

SALAS if he could provide multi-pound quantities of methamphetamine. SALAS said he could.

c. Gabriel SALAS then gave TFO Finneran prices for pounds of methamphetamine, telling TFO Finneran the more he bought the better the price. The CS and TFO Finneran indicated to SALAS, that they wanted a sample of methamphetamine and would want to make a larger purchase after the sample was tested.

d. Gabriel SALAS provided TFO Finneran with a sample of methamphetamine. TFO Finneran subsequently purchased four ounces of methamphetamine for $1,500. The four ounces in addition to the sample tested positive for methamphetamine.

10. On April 18, 2002, I disguised myself as a truck driver driving a tractor trailer in an effort to perform an undercover purchase of methamphetamine from workers at the SUBJECT PREMISES. I arrived at the SUBJECT PREMISES. An individual later identified as Juan SALAS approached me by my tractor-trailer and handed me a small amount of a crystal rock-like substance about the size of a small pebble. Based on my training and experience, I believed the substance to appear to be methamphetamine. I asked Juan SALAS how much four ounces of methamphetamine would cost and he replied fourteen hundred dollars. I then agreed to purchase four ounces of methamphetamine from Juan SALAS. He told me that it would take thirty minutes to deliver. I waited approximately one hour and Juan SALAS then approached my tractor-trailer and handed me a clear plastic package containing a off-white rocky substance that appeared to be consistent with methamphetamine. I paid Juan SALAS $1, 400 and discussed with him the further purchase of a pound of methamphetamine and then departed. I later field-tested the contents of both the sample and the four ounce package, both of which tested positive for the presence of methamphetamine. I was able to identify the individual who had sold the

7

methamphetamine to me as Juan SALAS by a photograph of him taken by the Barstow Police to whom he identified himself as "Juan SALAS." The photograph attached hereto as Exhibit 3 depicts the individual I interacted with whom I understood to be Juan SALAS.

11. On June 10, 2002, TFO Finneran, acting in an undercover capacity, called Gabriel SALAS, at the telephone number that Gabriel SALAS had provided to him on April 11, 2002 (760-668-3907). I listened in on the conversation, and heard the following:

a. TFO Finneran spoke to an unidentified female. This female directed TFO Finneran to call Gabriel SALAS at telephone number 760-256-6962. TFO Finneran called this number and spoke to a Hispanic male who identified himself as "Gabby";

b. TFO Finneran asked "Gabby" if he was working tomorrow? "Gabby" said he was working and would be there at 3:00 p.m. TFO Finneran told "Gabby" he wanted one (one pound of methamphetamine), "Gabby" told TFO Finneran that he would meet with him tomorrow. TFO Finneran asked for a price for one pound and "Gabby" said just come in tomorrow and see him. The call was then terminated.

12. On June 11, 2002, I and other members of the DEA's RDO, established surveillance in the area of SUBJECT PREMISES in an effort for an undercover agent to purchase one pound of methamphetamine from Gabriel SALAS for $5,000. TFO Finneran, acting in an undercover capacity ("UC"), along with a confidential source ("CS"), drove to the SUBJECT PREMISES in a tractor/trailer. TFO Finneran was wearing an audio recording and transmitting device. I was positioned in my pickup truck parked outside the SUBJECT PREMISES, watching TFO Finneran and the CS through binoculars, and listening to the audio transmission. Additionally, TFO Finneran called me on my cellular telephone to narrate his actions when he was able. I also

8

spoke to TFO Finneran after the undercover operation. While at the location the following occurred:

a. TFO Finneran advised me that he observed Gabriel SALAS, standing near the polish area of the truck stop located near the shed near the entrance to the truck wash.

b. TFO Finneran contacted Gabriel SALAS and asked to buy one pound of methamphetamine. He and Gabriel SALAS they negotiated for a price of $5,000. Gabriel SALAS advised TFO Finneran that it would take 20 minutes for the methamphetamine to be delivered. TFO Finneran and Gabriel SALAS spoke about a future buy of five pounds of methamphetamine. Gabriel SALAS advised it would cost $20,000 for the five pounds of methamphetamine. TFO Finneran remained by his truck parked truck wash and the restaurant on the SUBJECT PREMISES.

c. I observed a 2-door red Nissan Stanza arrive at the SUBJECT PREMISES. At this time, TFO Finneran read the license plate out loud and I was able to record it by listening to the audio transmission. The license plate number was California No. 2FEL696. I then saw the driver get out of the Stanza and hand a grocery store-style plastic bag with contents to Gabriel SALAS near the shed at the entrance to the truck wash on the SUBJECT PREMISES. I saw Gabriel SALAS enter the shed with the bag, exit without it, and then walk over to meet with TFO Finneran who was waiting by his truck.

d. TFO Finneran told me later that, when Gabriel SALAS returned from the shed, he told TFO Finneran that the methamphetamine had been delivered. TFO Finneran walked with Gabriel SALAS to the shed located by the entrance to the truck wash. TFO Finneran later told me that, at this point, Gabriel SALAS handed him a clear plastic-wrapped package containing an

9

off-white compressed substance. TFO Finneran handed Gabriel SALAS $5,000 in "pre-recorded funds – that is, federal reserve notes for which the serial numbers had been recorded in advance. TFO Finneran later advised that he observed Gabriel SALAS hand the money to the driver of the red Nissan, who departed.

    e. I observed the red Nissan Stanza leave the SUBJECT PREMISES and drive southbound on L Street. I radioed to CHP Officer Mike Blaine, and asked him to make an enforcement stop of the Nissan. Later than evening, I spoke with Officer Blaine, who told me the following: Officer Blaine pulled the driver over on L Street at Ironwood Drive in Barstow. Officer Blaine asked the driver of the red Nissan his name, and the driver told Officer Blaine it was "Oscar ORTEGA." Officer Blaine had observed a large bulge in ORTEGA's left front pocket. Out of concern for his safety, Officer Blaine reached in the pocket and removed $4,000, all in $100 bills. Officer Blaine recovered the $4,000 and gave ORTEGA a receipt Officer Blaine cited and released ORTEGA. Officer Blaine turned the $4,000 over to me. I later confirmed by reviewing the serial numbers of the bills that these were a portion of the funds that had been pre-recorded. Officer Blaine took the photograph of ORTEGA attached hereto as Exhibit 4, and showed it TFO Barron, who showed it to me to me, indicating it depicted the man Blaine had stopped and from whom taken the pre-recorded funds.

    f. TFO Finneran field tested the contents of the package Gabriel SALAS had given him. It tested positive for the presence of methamphetamine. I later sent the package to the DEA's Southwest Regional Laboratory, and received the test results, which indicated that the package contained 450.6 grams of 15% purity methamphetamine.

    13. On 08-12-02 at approximately 1730 hours, I and other members of the DEA's RDO,

10

established surveillance in the area of SUBJECT PREMISES. TFO Finneran and a CS arrived at

the SUBJECT PREMISES in an undercover (UC) tractor-trailer vehicle ("UC Tractor"). TFO

Finneran was equipped with a transmitting device to record conversations. DEA Special Agent

("S/A") Ashcraft was also in the UC Tractor and video taped the following transaction. I was

positioned in my pickup truck parked outside the SUBJECT PREMISES, watching TFO

Finneran and the CS through binoculars, and listening to the audio transmission. Additionally,

TFO Finneran called me on my cellular telephone to narrate his actions when he was able. I also

spoke to TFO Finneran and S/A Ashcraft after the undercover operation. While at the location

the following occurred:

    a. At approximately 1731 hours, TFO Finneran advised me that Gabriel SALAS was

approaching the drivers' side door of the UC Tractor.

    b. At approximately 1735 hours, TFO Finneran advised that he contacted Gabriel

SALAS. TFO Finneran advised he spoke to Gabriel SALAS about wanting to buy six pounds of

methamphetamine for $26,000. TFO Finneran told me that Gabriel SALAS advised he will check

to see how long it will take.

    c. At approximately 1750 hours, TFO Finneran advised me that Gabriel SALAS had told

him it would be about 1 ½ hours before he could have the six pounds of methamphetamine.

Gabriel SALAS also advised he did not want to do the deal at the SUBJECT PREMISES,

because it was hot (referring to a large amount of police activity). Gabriel SALAS advised he

wanted to meet at the Wal-Mart parking lot in Barstow, California. TFO Finneran advised that he

would give Gabriel SALAS a call in about 1 ½ hours. TFO Finneran and the CS then left the

SUBJECT PREMISES.

11

d. At approximately 1908 hours, TFO Finneran and the CS drove the UC Tractor to the Barstow Mall, located at 1876 E. Main St., Barstow, California. A also set up surveillance at the Barstow Mall in the same manner as I had previously at the SUBJECT PREMISES, parking in a location where I had a good view of the UC Tractor. I listened over the audio transmission as TFO Finneran called Gabriel SALAS, advised Gabriel SALAS of TFO Finneran's location and that he was ready. TFO Finneran told me that Gabriel SALAS advised that he would be on the way.

e. At approximately 1939 hours, I observed a silver Dodge pickup arrive and park near the UC Tractor. I could see that this Dodge pickup had a California. license plate of 6A82744. TFO Finneran got out of the UC Tractor to approach the Dodge.

f. TFO Finneran later told me that, as he walked toward the Dodge, he saw Gabriel SALAS and Ramon Martinez RODRIGUEZ get out of the Dodge. TFO Finneran was familiar with RODRIGUEZ because RODRIGUEZ had been seen during previous surveillance at the SUBJECT PREMISES, and learned his identity by talking to Barstow Police Department officers who had interviewed RODRIGUEZ. TFO Finneran was shown the photograph of RODRIGUEZ attached hereto as Exhibit 2 (right side) and advised by Barstow Police that the individual depicted had identified himself as RODRIGUEZ. TFO Finneran then saw RODRIGUEZ place an object into the bushes next to the Dodge. TFO Finneran then spoke to Gabriel SALAS nearby the Dodge. Gabriel SALAS told TFO Finneran that Gabriel Salas had two pounds of methamphetamine which had been placed in the bushes, and that the other four pounds would be arriving soon.

g. At approximately 1941 hours, I observed a red Nissan, driven by an unknown Hispanic

12

Lopez-Perez, Jose Manuel   1095512

male arrive at the Barstow Mall. The Hispanic male drove next to the Dodge pickup and handed SALAS a blue/yellow backpack. Gabriel SALAS placed the backpack into the bed of the Dodge. The Hispanic male drove away in the red Nissan.

h. At approximately 1944 hours, TFO Finneran called me and advised that he needed to see the money. I called another UC officer to direct the officer to "flash" some money to Gabriel SALAS. I watched as the other UC officer drove to nearby the Dodge and Finneran. Finneran later told me that he had called Gabriel SALAS over to the UC officer's vehicle and opened the passenger door, directing Gabriel SALAS to look at the U.S. currency that was sitting on the right front passenger seat. TFO Finneran told me that Gabriel SALAS acknowledged the money and then TFO Finneran ordered the UC officer to drive away, which the UC officer did.

i. TFO Finneran later told me that Gabriel SALAS told him he was dissatisfied with the "flash" of money. I watched as Gabriel SALAS walked back to the Dodge and he and RODRIGUEZ moved the Dodge to another parking stall. I watched as TFO Finneran again approached the Dodge. TFO Finneran later told me:

   i)   He told Gabriel SALAS and RODRIGUEZ that he wanted to see the six pounds of methamphetamine before he would deliver the money.

   ii)  TFO Finneran then grabbed the backpack from the bed of the Dodge and told Gabriel SALAS that he would call for the money when he confirmed that the six pounds of methamphetamine were present. Gabriel SALAS assented to this.

   iii) TFO Finneran looked into the backpack and counted several packages wrapped in plastic and zip-lock bags, containing an off-white chunky

13

substance he believed to be consistent with methamphetamine.

iv)         TFO Finneran told Gabriel SALAS that he would return to the UC

Tractor and call for the money handler to return.

j. I watched as TFO Finneran and Gabriel SALAS returned to the UC Tractor.  TFO

Finneran later told me that, at this point, he had put the backpack containing the packages into

the UC Tractor.  Finneran called me to ask for the money, which was our pre-arranged signal for

me to call in a pre-arranged ruse traffic stop of an unrelated vehicle.

k. At approximately 1955 hours, I observed TFO Philpott driving his UC vehicle into the

Barstow Mall parking lot with two California Highway Patrol (CHP) vehicles behind (lights and

siren activated). TFO Philpott stopped his UC vehicle and the two CHP vehicles stopped near the

UC Tractor.  Gabriel SALAS observed the enforcement activity and began to run away from the

UC Tractor.  UC Finneran entered the UC Tractor with the CS and drove out of the Barstow Mall

Parking Lot and onto the freeway.

l. At approximately 2020 hours, the surveillance was terminated.  I then met with TFO

Finneran at a predetermined location and field tested the contents of the packages TFO Finneran

gave me, which both tested positive for the presence of methamphetamine.  I subsequently

submitted the packages to the DEA's Southwest Regional Laboratory, and received the test

results, which indicated that the several packages contained a total of 2708.1 grams of

approximately 8 ½ % purity methamphetamine.

14. On October 17, 2002, I was acting in an undercover capacity (UC), along with UC

Officer Alex Santos, went to the SUBJECT PREMISES in attempt to contact Juan SALAS and

discuss the purchase of four pounds of methamphetamine.  I spoke to Juan SALAS on the

14

telephone, while at the SUBJECT PREMISES . I also met with Gabriel SALAS, discussing the future purchase of four pounds of methamphetamine. I also witnessed several drug transactions occurring in the parking lot of the SUBJECT PREMISES. These transactions occurred between the truck wash employees and truck drivers arriving at the SUBJECT PREMISES. I notified surveillance units of trucks leaving the truck stop, which were involved in drug transactions. CHP units made legal probable cause enforcement stops on two trucks, which led to two arrests for possession of methamphetamine and under the influence of a controlled substance.

15. On November 4, 2002, acting in an undercover capacity (UC), I called Juan SALAS regarding a meeting to discuss the purchase of multiple pounds of methamphetamine. I went to the SUBJECT PREMISES in attempt to contact Juan SALAS and discuss the purchase of four pounds of methamphetamine. I met Gabriel SALAS and spoke to Juan SALAS on the telephone, while at the SUBJECT PREMISES.

16. On November 14, 2002, acting in an undercover capacity (UC), I called Gabriel SALAS and Juan SALAS regarding a meeting to purchase two pounds of methamphetamine.

a. On November 14, 2002 at approximately 1055 hours, acting in undercover capacity, I called Gabriel SALAS at 760-256-6962. This conversation was recorded. Gabriel SALAS answered the telephone and advised he remembered me. I advised I would be coming to the SUBJECT PREMISES, and asked if he would be working. Gabriel SALAS advised that he will be working. I also asked Gabriel SALAS to make sure Juan was also working today at the truck stop. Gabriel SALAS said yes and the phone call was terminated.

b. At approximately 1400 hours, I called Gabriel SALAS at (760) 668-3907. This conversation was recorded. I asked Gabriel SALAS what time he started work today and Gabriel

15

SALAS said 3:00 p.m. I told him I would travel to the SUBJECT PREMISES after that time. I asked Gabriel SALAS to make sure Juan SALAS is at the truck stop to do the deal, which Gabriel SALAS agreed. I told him I would see him later and the conversation was terminated.

c. At approximately 1530 hours, I called Juan SALAS at (760) 256-2054. Juan SALAS answered the telephone and advised he remembered me. I inquired if he would be at the SUBJECT PREMISES today and asked if he was working. Juan SALAS advised that he will be working. I advised him I was ready to do the deal. Juan SALAS indicated that he would proceed with the deal and I said I would see him later. The phone call was then terminated.

d. At approximately 1640 hours, UC Officer Alex Santos and I arrived at the SUBJECT PREMISES, driving a UC Tractor. The UC Tractor was equipped with audio and video recording equipment. TFO Randy BARRON and TFO Dave Gorlicki were in the sleeper area of the UC Tractor monitoring the audio receiver and video. When we parked the UC Tractor, Gabriel SALAS approached the driver's side window. Gabriel asked us to park the UC tractor next to the other tractor/trailers in the center of the parking lot. We drove the UC tractor and parked it in the center of the parking lot.

e. At approximately 1643 hours, Santos and I got out of the UC tractor and walked back towards the shed near the entrance to the truck wash, where Gabriel SALAS was standing. I asked if Juan SALAS was at the truck stop. Gabriel SALAS told me that he was not at the truck stop, because he was in trouble at court. I asked Gabriel SALAS to call Juan on his telephone, so I could talk with him about the methamphetamine deal. Gabriel SALAS used his cellular telephone and called Juan SALAS. Gabriel SALAS then handed his telephone to me and I asked Juan SALAS if he was coming to the truck stop, to which Juan SALAS replied "no," because of

16

problems at the court that day. I advised Juan SALAS I didn't want to do the deal without him. Juan SALAS advised me that his brother Gabriel would take care of us. Juan SALAS advised that he would talk with Gabriel SALAS and tell him that it is alright to do the deal with me. I handed the telephone back to Gabriel SALAS and Gabriel SALAS spoke to Juan SALAS and then ended his phone call.

     f. I asked Gabriel SALAS if he had the two pounds of methamphetamine for $9,500. Gabriel SALAS advised he had one pound ready, but it might take some time to get the other pound. Gabriel SALAS also advised the price was $10,000 for the two pounds of methamphetamine. I asked how long it would take for the two pounds and Gabriel SALAS advised 40 minutes. I told him I needed to call my money guy to see if he wanted to buy the 2 pounds for $10,000. I made a phone call and then advised Gabriel SALAS that since I came all the way up to Barstow I would buy the 2 pounds for $10,000. I advised Gabriel SALAS that I and the other UC would wait in the truck stop.

     g. At approximately 1725 hours, Gabriel SALAS contacted me at the passenger side door of the UC Tractor. Gabriel SALAS advised it would be 40 more minutes. I asked if he was sure and Gabriel SALAS said yes. Gabriel SALAS asked if I was a "cop" and I asked Gabriel SALAS if he was a "cop". I told him I worked with Juan SALAS in the past and didn't want any problems. I told Gabriel SALAS to call Juan SALAS if he had any problems with him. Gabriel SALAS said alright and asked if I wanted to come back in 40 minutes or stay. I advised I would stay at the truck stop.

     h. At approximately 1730 hours, Gabriel SALAS contacted me at the right passenger side door and advised the 2 (pounds of methamphetamine) would be here in 5 minutes. Gabriel

17

SALAS asked if I had the money ready. I advised I would call in the money when I saw the product. I confirmed it would be $10,000 for the two pounds, and Gabriel SALAS agreed. Gabriel SALAS again asked if I had the money and I advised the money would arrive when I look at the methamphetamine. Gabriel SALAS agreed and walked away.

     i. At approximately 1744 hours, I observed a black Chevy mini-Blazer, bearing California license plate of 3LID778, arrive and the solo-male driver contact Gabriel SALAS and hand him a black plastic package. I identified the solo-driver as a Hispanic male, 5'7", 200 lbs., short brown hair, wearing a brown jacket, white T-shirt, and blue jeans.

     j. At approximately 1746 hours, Gabriel SALAS contacted the UC's from the drivers side and attempted to enter the cab. Gabriel SALAS handed me a black plastic bag, appearing to be the same one that had been handed from the black Blazer, which contained an off-white rocky substance in two clear plastic bags, which appeared to me based upon my training and experience to be consistent with methamphetamine. I gave the pre-arranged audible alert for a Barstow P.D. Officer to conduct a ruse traffic stop. I told Gabriel SALAS and UC Santos to exit the UC tractor and meet on the passenger side. I opened the passenger side door, exited the UC tractor, and started opening the black plastic bag on the passenger side floor. UC Santos and Gabriel were standing behind me. Gabriel advised it was only 1 pound 14 ounces and it would only cost $9,500. Gabriel suddenly yelled "be careful", and ran away from the tractor towards the truck wash. I gathered the methamphetamine and began to run in a Northerly direction from the tractor.

     k. At approximately 1750 hours, Barstow Police Officer Andrew Ellis took me into custody with the packages. Officer Ellis drove from the truck stop, followed by G/S Brian H. Lee, and released me.

18

l. Later that evening I met with CHP Officer Mike Blaine, who told me that he had been asked by another member of my surveillance team to make a traffic enforcement stop of the driver of the black Chevy mini-Blazer, bearing California license plate of 3LID778. I was shown a picture of the solo-male driver who Officer Blaine had found to be driving the black mini-Blazer that delivered the packages I had just received from Gabriel SALAS. The photo was taken by CHP officer Blaine, who reported that the subject of the photo had identified himself as "Jose Manuel Lopez PEREZ." A copy of the photograph is attached hereto as Exhibit 5.

m. I field tested the contents of the packages I had received from Gabriel SALAS, which tested positive for the presence of methamphetamine. I subsequently submitted the packages to the DEA's Southwest Regional Laboratory, and received the test results, which indicated that the two packages contained a total of 832.3 grams of approximately 11% purity methamphetamine.

PROBABLE CAUSE FOR SEARCH

16. Since the initial undercover purchases of methamphetamine from employees at the SUBJECT PREMISES, I have been investigating the potential involvement and/or complicity of the owners and operators of the Heartland Truck Stop in the methamphetamine distribution taking place at the SUBJECT PREMISES. For these reasons, our task force has conducted surveillance and undercover operations on a number of occasions since November of 2002 at the SUBJECT PREMISES.

17. I have personally conducted surveillance at the SUBJECT PREMISES, both during undercover operations and during separate static surveillance, on at least fifteen occasions from March of 2002 through October of 2005. On every occasion I have been present at the SUBJECT PREMISES, I have witnessed hand-to-hand narcotics transactions take place. I have

19

also seen that the employees at the SUBJECT PREMISES have access to, and freely enter and leave all of the structures located on the SUBJECT PREMISES, including the truck wash bay, the manager's office, the restaurant and outlying sheds and storage structures. This has been true on each occasion I have conducted surveillance or investigations.

18. Set forth below are examples of apparent narcotics transactions I have witnessed during my undercover investigations and surveillance. This is not intended to be a complete list, because I have witnessed at least one hundred or more apparent narcotics transactions of a fashion similar to that set forth below.

19  On October 17, 2002, I conducted surveillance of the SUBJECT PREMISES from a truck parked inside the SUBJECT PREMISES. Between the hours of 1515 through 1700, I witnessed approximately five hand-to-hand apparent narcotics transactions. All of the transactions were conducted in a similar manner. A trucker would contact an employee near the shed near the entrance to the truck wash bay. The trucker would be asked to wait or to park in the center truck parking area of the SUBJECT PREMISES. The truck stop employee would walk either into the truck wash bay or the nearby shed and would return carrying a small package and deliver it to the trucker. The trucker would then exchange money for the package. On this date, following the transactions, I radioed to CHP officers to conduct traffic stops of the involved trucks after they had left the SUBJECT PREMISES. The CHP officers who conducted traffic stops at my request reported back to me that two of the truckers who had engaged in such transactions were stopped by a CHP unit shortly after they had driven their trucks out of the SUBJECT PREMISES and were found to possess methamphetamine. (The three other truckers were not stopped.)

20

20. On February 26, 2004, I conducted surveillance of the SUBJECT PREMISES from a van parked inside the SUBJECT PREMISES. Between the hours of 1440 through 1805, I observed eight apparent hand-to-hand narcotics transactions conducted in a manner similar to those on October 17, 2002.

21. On March 5, 2004, I conducted surveillance of the SUBJECT PREMISES from a van parked across the street from the SUBJECT PREMISES. Between the hours of 0730 to 1130 I observed two apparent hand-to-hand narcotics transactions conducted in a similar manner to those I had previously seen conducted.

22. On May 5, 2004, I conducted surveillance of the SUBJECT PREMISES from a van parked across the street from the SUBJECT PREMISES. Between the hours of 0930 to 1630, I observed twelve transactions conducted in a similar manner to those I had previously seen conducted.

23. On August 26, 2004, I conducted surveillance of the SUBJECT PREMISES from a van parked across the street from the SUBJECT PREMISES. Between the hours of 1150 to 1740, I observed thirteen transactions conducted in a similar manner to those I had previously seen conducted.

24. On September 21, 2004, I conducted surveillance of the SUBJECT PREMISES from a van parked across the street from the SUBJECT PREMISES. Between the hours of 1130 to 1650, I observed eleven transactions conducted in a similar manner to those I had previously seen conducted. CHP officers who conducted traffic stops at my request reported back to me that four of the truckers who had engaged in such transactions were stopped by CHP units after leaving the SUBJECT PREMISES and were found to possess methamphetamine. Two of the truckers

21

admitted, after having been advised of their Miranda rights, that they had just bought the methamphetamine from an employee of the Heartland Truck Stop at the SUBJECT PREMISES. (The other seven trucks were not stopped.)

25. On May 3, 2005, I conducted surveillance of the SUBJECT PREMISES from a van parked across the street from the SUBJECT PREMISES. Between the hours of 1410 to 1755, I observed eight transactions conducted in a similar manner to those I had previously seen conducted. CHP officers who conducted traffic stops at my request reported back to me that two of the truckers who had engaged in such transactions were stopped by CHP units after leaving the SUBJECT PREMISES and were found to possess methamphetamine. (The other six were not stopped.)

26. On August 24, 2005, I conducted surveillance of the SUBJECT PREMISES from a truck parked across the street from the SUBJECT PREMISES. Between the hours of 1345 to 1800, I observed seven transactions conducted in a similar manner to those I had previously seen conducted. Law enforcement officers who conducted traffic stops at my request reported back to me that six of the truckers who had engaged in such transactions were stopped by CHP, San Bernardino County Sheriff's Officers and Barstow Police units after leaving the SUBJECT PREMISES and were found to possess methamphetamine. Five of the truckers admitted, after having been advised of their Miranda rights, that they had just bought the methamphetamine from an employee of the Heartland Truck Stop at the SUBJECT PREMISES. (The other truck was not stopped.)

27. On October 26, 2005, I conducted surveillance of the SUBJECT PREMISES from a truck parked across the street from the SUBJECT PREMISES. Between the hours of 1415 to

22

1750, I observed seven transactions conducted in a similar manner to those I had previously seen conducted. Law enforcement officers who conducted traffic stops at my request reported back to me that two of the truckers who had engaged in such transactions were stopped by CHP and San Bernardino County Sheriff's Officers units after leaving the SUBJECT PREMISES and were found to possess methamphetamine. One of the truckers admitted, after having been advised of his Miranda rights, that he had just bought the methamphetamine from an employee of the Heartland Truck Stop at the SUBJECT PREMISES. (The other five trucks were not stopped.)

28. On or about April 9, 2003, I spoke with cooperating defendant D.L. Cooperating defendant D.L ("D.L.") had been charged with a drug trafficking crime for his transport of methamphetamine from the SUBJECT PREMISES, but had no other criminal history. D.L. told me that he had purchased methamphetamine at the SUBJECT PREMISES on a number of occasions, and was familiar with the sales practices at the SUBJECT PREMISES. He stated that the truck wash employees would carry the methamphetamine on their person and would also hide it inside holes in the truck wash area and the shed near the entrance to the truck wash, and would also bury it in the nearby desert.

29. On or about September 28, 2004, I spoke with a confidential employee source ("CES") who was employed at the SUBJECT PREMISES.1 The CES .told me the following:

a. The proprietors of the Heartland Truck Stop, located on the SUBJECT PREMISES, take a percentage of the proceeds from the methamphetamine sales of Heartland employees such as Gabriel SALAS. The proprietors spend most of their time at work in the manager's office located at the Southwest corner of the SUBJECT PREMISES, however one of the proprietors

---

1 The CES has an approximately twenty five year old conviction for misdemeanor petty theft, as well as a more recent misdemeanor "drunk and disorderly" conviction in 1998.

often visits the truck wash area in order to collect methamphetamine proceeds. This proprietor owns firearms. The CES indicated that there is a safe in the manager's office.

b. The CES also said that there was another safe in the cashier's office attached to the truck wash.

c. One of the proprietors frequently enters the garage area attached to the restaurant building remains for long periods of time, and exits the area carrying plastic bags containing unknown items.

d. Employees sometimes enter and exit the manager's office, and employees also visit the restaurant area frequently.

30. Based on my training and experience, and on my consultation with other law enforcement officers experienced in investigations regarding conspiracy to manufacture, distribute and possession with intent to distribute controlled substances, I have learned the following:

a. Individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses. Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes. This evidence, which is discussed in detail in the following paragraphs, includes drugs, paraphernalia for weighing, packaging, and distributing

24

drugs, other contraband, records and evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

b. Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution. The paraphernalia includes packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances. Drug dealers commonly store these items on their person, in their residences, in their businesses, in the residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

c. Drug dealers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records often remain for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers, and co-conspirators. These records can be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay-owe sheets, IOU's, miscellaneous notes, money orders, customer lists, and telephone address books.

d. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances, customer lists, and amounts of money owed to the trafficker by his customers, and by the trafficker to his suppliers.

e. Records often indicate locations and distribution points of controlled substances, and the purchase of materials, supplies and articles used by the trafficker and co-conspirators in the distribution of controlled substances.

25

f. Records frequently include the identification of properties such as real property or vehicles owned, rented, leased, controlled, or otherwise utilized by the trafficker and his co-conspirators in the distribution of controlled substances. These records include property rental and ownership records such as deed of trust and lease and purchase agreements, and vehicle registration, rental and ownership information.

g. These items are stored by drug dealers on their person, in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and cars.

h. Additionally, drug dealers usually sell their product for cash. Because pound quantities can sell for thousands of dollars even at the wholesale level, dealers typically may have thousands of dollars in cash on hand both as proceeds of sales and to purchase their own supplies. In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

i. Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs. To accomplish these goals, drug traffickers utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious. They also try to secrete, transfer, and conceal the money, by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes, and safety deposit boxes, or (d) using the money to buy assets which are difficult to trace. This evidence is

26

useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws.

j. Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized. Documents and items showing the identity of the persons owning, residing in, or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds, and mortgage receipts.

k. Drug dealers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property, and their drugs. They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, or the residences of friends or relatives.

l. Drug dealers often maintain firearms and ammunition on their person or in their homes, businesses, or cars to protect themselves and their drugs and their drug profits. They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, and instruction manuals and other documentation for firearms and ammunition

27

## CONCLUSION

31. Based upon the foregoing, I submit there is: (1) probable cause to believe that Gabriel SALAS, Juan SALAS, and Jose Manuel Lopez PEREZ violated Title 21 United States Code, section 846; and that Oscar ORTEGA and Ramon Montez RODRIGUEZ violated Title 21, United States Code, section 841 (a) (1); and (2) probable cause to believe that the items set forth in Attachment B: "Items to be Seized" will be found at the SUBJECT PREMISES.

Robert A. Mendenhall
Task Force Officer – Drug Enforcement Administration

Sworn and Subscribed to in my presence
On this day 10 of November, 2005.

STEPHEN G. LARSON
UNITED STATES MAGISTRATE JUDGE

28



FROM SAN BERNARDINO COUNTY SHERIFF CAL-ID          (WED)11. 7'07 10:22 ST 10:16 NO.4065,49625 P 2

361 732 504

04- 8645

LOPEZ-PEREZ, JOSE MANUEL

FID 1045512

04080800114

DATE OF BIRTH 03-03-1973    M    H    508    200    BRO    BRO



Date: 11/02/07

I hereby certify that the copies of the
fingerprint card(s) are true and accurate
copies of those in my custody.

By Rosa Gonzalez

San Bernardino Sheriff's Department
Scientific Investigations/CAL-ID
880 E. Mill Street
San Bernardino, CA 92415-0054